# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| Edward E. Blackorby, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. |
| | ) |
| BNSF Railway Company, | ) |
| a corporation, | ) |
| | ) |
| Defendant. | ) |

## COMPLAINT AND DEMAND FOR JURY

### Nature of Action

1. This is an action by Plaintiff Edward E. Blackorby ("Ed") against Defendant BNSF Railway Company ("BNSF") to recover damages for injuries and for other relief under the employee-protection provision of the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA") and the Federal Employers' Liability Act, 45 U.S.C. § 51 *et seq*. ("FELA").

2. On August 20, 2012, Ed timely filed a complaint under 49 U.S.C. § 20109 with the U.S. Department of Labor Occupational Safety and Health Administration's ("OSHA") Region 7 office in Kansas City, Missouri. On June 17, 2013, OSHA issued Secretary's Findings that BNSF was in violation of Ed's rights under the FRSA but the relief ordered by OSHA did not make Ed whole. On July 2, 2013, Ed timely filed a notice of objection with the U.S. Department of Labor Office of Administrative Law Judges ("OALJ") as to the Secretary's Findings only with respect to the issue of the relief ordered and to reserve the right to present evidence as to the "reasonable attorneys fees" that OSHA ordered BNSF to pay. On July 12, 2013, BNSF filed "Objections and Request for Hearing" with the OALJ as to the June 17, 2013

Secretary's Findings. On August 28, 2013, more than 210 days having elapsed with no final decision from decision from the Secretary of Labor, Ed gave the OALJ fifteen (15) day notice of his intention to exercise his right to file an original *de novo* action in district court pursuant to 49 U.S.C. § 20109(d)(3).

## Parties

3. Ed is, and was at all times material, a Missouri resident employed by BNSF and working throughout Missouri and neighboring states as directed by BNSF.

4. BNSF is a rail carrier engaged in interstate commerce as defined by 49 U.S.C §§ 20102 and 20109. BNSF operates in twenty-eight (28) states including Missouri, employs approximately 40,000 people, and is one of the nation's largest rail carriers. BNSF maintains its corporate headquarters in Fort Worth, Texas.

## Jurisdiction and Venue

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 49 U.S.C. § 20109, and 45 U.S.C. § 51.

6. Venue is proper in the Western District of Missouri pursuant to 28 U.S.C. § 1391 because BNSF conducts substantial business here, Ed is a Missouri resident, and the majority of the events complained of occurred in Missouri.

## Statement of Facts

7. At all times material, Ed was assigned by BNSF to work on a mobile steel gang and he was sent by the Company to maintain and repair railroad track anywhere on its tracks between Chicago and St. Louis.

8. On March 7, 2012, Ed was assigned to work in Morrison, Oklahoma. While stationed in Morrison, Ed was housed by BNSF at a hotel along with supervising Foreman Kevin Wheeler ("Kevin") and the rest of the work gang.

9. Upon information and belief, the winds in Morrison that day were whipping up to nearly forty (40) miles per hour and Ed, as he had been his entire career, was out in the middle of it carrying out the responsibilities he had been given by Foreman Kevin.

10. Foreman Kevin was designated by BNSF to supervise and direct the work of Ed and his co-workers on March 7, 2012. No salaried, management-level employees were present in Morrison that day.

11. Due to the negligence of BNSF and its disregard for the present working conditions, Ed sustained an injury when the wind blew a foreign object into his right eye. Ed initially believed the object to be sand.

12. At the end of his long day working in the high winds of Oklahoma, Ed returned to the hotel and experienced constant burning and irritation in his right eye. Ed attempted to flush his eye with eye drops but the burning and irritation continued.

13. Ed notified Foreman Kevin that he believed he had got something in his eye while working that day in the high winds.

14. Kevin, the only BNSF supervisor in Morrison and the individual directing Ed's work, advised Ed to get some saline at Walgreen's. At no time did Kevin instruct Ed to take any other action or make any formal report of his eye irritation.

15. Despite his best efforts, Ed was unable to relieve the burning and irritation in his eye that night and, after calling his wife Lisandra at home, he went to bed.

16. The following day, March 8, 2012, Ed drove home to Ozark, Missouri for a previously scheduled dentist appointment on Friday, March 9, 2012. The pain from his tooth and the apprehension of what he would endure the next day in the dental chair overcame his concern for the lingering burning and irritation in his eye. Still, when he arrived home, he reported to his wife Lisandra that the burning and irritation in his eye lingered.

17. Ed completed the dental procedure on Friday, March 9, 2012 and returned home to recover. However, the burning and irritation in his eye never subsided and his discomfort persisted throughout the day.

18. Ed awoke Saturday morning, March 10, 2012, to find his right eye swollen and completely closed off. He was still experiencing the burning and irritation, but was unable to find an eye doctor open on a Saturday.

19. On Sunday, March 11, 2012 Ed found the pain unbearable. Lisandra had the idea of going to LensCrafters at the Springfield Mall, about thirty (30) minutes from their home in Ozark.

20. Lisandra accompanied Ed to the appointment where the eye doctor at LensCrafters found and removed a small piece of steel with a rust ring on it from Ed's eye.

21. The doctor prescribed Ed antibiotics and scheduled a follow up appointment for the next day, March 12, 2012.

22. Immediately following the initial appointment, Ed phoned BNSF Roadmaster Douglas Turney ("Turney"), a salaried management official and Ed's direct supervisor at the time.

23. Ed notified Turney that he had received medical treatment from the doctor at LensCrafters and that the doctor had removed a piece of steel from his right eye and prescribed

antibiotics. Ed explained to Turney his belief that the piece of steel had got in his eye on March 7, 2012 and was the cause of the burning and irritation that he previously reported to Foreman Kevin.

24. On Monday March 12, 2012, Turney phoned Ed and informed him that BNSF Assistant Director of Maintenance Production, James Sadler ("Sadler"), would be attending his doctor appointment that day. Sadler ranked above Turney in the BNSF hierarchy. Ed was not given a choice as to whether Sadler would attend his medical appointment.

25. When Ed and Lisandra arrived at LensCrafters the next morning for the follow up appointment, Sadler was already waiting in the lobby. Sadler immediately confronted Ed and asked what had happened. Ed told Sadler the simple truth: he had got something in his eye while working in the Oklahoma winds on March 7, 2012. Ed explained to Sadler how he had reported the eye irritation to Foreman Kevin at that time. Sadler acknowledged how windy it could get in Oklahoma and referenced "Oklahoma dust" flying around. Sadler did not question the legitimacy of Ed's injury or the manner in which it was reported to Kevin.

26. After meeting with the doctor, Ed and Lisandra walked out of the examining room and were again confronted by Sadler. Sadler demanded to know what procedures Ed had undergone and repeatedly asked Ed whether he planned to "report" the injury. He instructed that if Ed could not pinpoint exactly how the steel entered his eye, the injury was not "reportable." Sadler further instructed Ed to just say the injury happened "off-duty."

27. From his conversation with Sadler and knowledge of reports made by other employees, Ed believed that an official injury report under BNSF procedures would very likely subject him to a disciplinary investigation. Sadler's intimidating and coercive conduct in the lobby of LensCrafters strengthened this belief.

5

Case 4:13-cv-00908-FJG   Document 2   Filed 09/17/13   Page 5 of 13

28. Ed expressed to Sadler his fear of having to go through a disciplinary investigation for reporting an injury. Sadler responded by telling Ed that a disciplinary investigation would only be conducted if Ed made the decision to "report" the injury.

29. Ed reiterated to Sadler that he couldn't possibly pinpoint exactly when and how the steel had worked its way into his eye but he knew it happened on March 7th, and he knew there was no way he could have prevented it because he was wearing all of the required protective equipment while working. Ed explained how windy it could get out there and Sadler agreed.

30. Still Sadler dialed up the pressure through further threats, intimidation and coercion. He told Ed that what was said about the injury would determine whether it was reportable or not. "The ball is in your court," said Sadler. Ed understood this to be a threat by Sadler such that if he claimed the injury to be work related, he would be subject to discipline. But if he lied and said he knew it didn't happen at work, he would not be subject to discipline.

31. Ed rightfully replied that the ball was actually in BNSF's court because he had already notified Kevin Wheeler, Douglas Turney, and now James Sadler of his work related injury. Because Ed received medical treatment and a prescription for his injury, BNSF was required by federal regulation to report Ed's injury to the Federal Railroad Administration. *See* 49 C.F.R. §§ 225.11 and 225.19.

32. Still, Sadler remained unrelenting. Ed, squeezing ever tighter on Lisandra's hand as the stress of Sadler's interrogation increased, finally told Sadler just to mark him off work for the day so that they could move on.

33. Sadler tried to twist Ed's words into a concession but Ed was resolute. One more time he explained to Sadler that he knew he got the piece of steel in his eye while working in the high Oklahoma winds on March 7, 2012.

34. Sadler continued with his intimidation and coercive tactics, again questioning whether Ed was going to "report" his injury. Yet again, Ed informed Sadler that the injury needed to be reported.

35. Finally able to break free from the intimidating and coercive interrogation, Ed and Lisandra began the drive home with Ed immediately expressing fear that he would be fired over the small piece of steel in his eye. Lisandra was incredulous, not believing the actions of Sadler and BNSF to snuff out Ed's injury. Lisandra reminded Ed that it was his eye, not Sadler's, and that if he was to have long-term damage but lied now about how this happened, he would be without recourse.

36. Though scared, Ed knew his wife was right. Ed phoned Turney from the car and explained that he was reporting the injury as work related.

37. On March 13, 2012, Ed provided Turney with documentation of his injury and medical treatment. Turney responded by questioning whether Ed *really* wanted to "report" the injury as work related. Despite this continued pattern of intimidation, Ed stood strong and confirmed to Turney that he was indeed reporting the injury as work related.

38. Ed completed a BNSF Employee Personal Injury/Occupational Illness Report ("Personal Injury Report") at Turney's request.

39. Just two days later, on March 15, 2012, Ed's fear materialized. BNSF issued a notice ordering Ed to attend a disciplinary investigation alleging that he failed to immediately report his injury to the proper manager while on duty or company property. The disciplinary

notice instructed Ed to contact Sadler with questions, named Sadler and Turney as witnesses for the company, and was signed by Sadler's direct supervisor, Division Engineer Keith Samples.

40. The disciplinary notice did not reference any rules that Ed was charged with violating.

41. BNSF held a disciplinary investigation of Ed on May 22, 2012 with BNSF management official Justin Bland presiding.

42. Upon information and belief, the company almost always finds the charged employee guilty and such was Ed's fate here.

43. Prior to the disciplinary investigation, Ed's union representative requested in a letter to Sadler that BNSF provide her with a list of witnesses the company intended to call, all exhibits that BNSF intended to introduce, as well as a clarification of the charge(s) against Ed. BNSF rejected the union's request in its entirety.

44. At the outset of the disciplinary investigation, Ed's union representative objected to the proceedings and stated on the record that the charges against Ed were designed to intimidate and discipline Ed for reporting his injury. Over the objection, the disciplinary investigation continued on.

45. During the disciplinary investigation, Turney testified against Ed. Turney did not identify any specific rule that Ed had allegedly violated and no such rule was ever identified or entered into the record of the investigation.

46. During the investigation, Ed testified that he got something in his eye at work in the high winds on March 7, 2012, that he had notified Foreman Kevin on that same day at the hotel, that he had notified Turney on March 11th, and that he had received medical attention for his injury.

47. Sadler was not presented by BNSF at the disciplinary investigation and therefore did not provide testimony nor was he available to be questioned by Ed. As the charged employee, Ed did not have any right to compel Sadler's appearance at the investigation. The disciplinary investigation lasted a total of thirty-eight (38) minutes.

48. On June 15, 2012, BNSF found Ed guilty of violating "MOWSR 1.2.5 Reporting" and assessed him discipline.

49. MOWSR 1.2.5 is a BNSF Maintenance of Way Safety Rule, the entire text of which states: "Make reports of incidents immediately to the proper manager."

50. BNSF assessed Ed with a Level S (Serious) thirty (30) Day Record Suspension and a One Year Review Period during which any rules violation could result in further disciplinary action as part of BNSF's progressive discipline policy.

51. On or about August 19, 2012, Sadler addressed two assistant foremen and explained that two employees under Sadler's supervision had been injured and that "fortunately one of them was man enough not to report it." It was clear to at least one of the assistant foremen that Sadler was disparaging Ed by insinuating Ed was not a "man" due to his having reported an injury and was also making a clear statement that injuries are not to be reported at BNSF.

52. BNSF has rules, policies and practices in place that require its employees to report all injuries, regardless of the severity, to the company.

## CAUSE OF ACTION ONE:
## VIOLATIONS OF ED'S RIGHTS UNDER SECTION 20109 OF THE FEDERAL RAIL SAFETY ACT

53. Ed incorporates by reference and re-alleges paragraphs 7-52 as though fully set forth herein.

54. The Federal Rail Safety Act ("FRSA"), at 49 U.S.C. § 20109 (a)(4) and 20109(c) and its implementing regulations at 29 C.F.R. § 1982 *et seq*. prohibits a railroad or its contractor from, among other things, disciplining, threatening, coercing, restraining, and intimidating employees who notify, or attempt to notify, the railroad carrier of a work related personal injury or illness. The FRSA also prohibits a railroad from denying, delaying, or interfering with the medical treatment of an injured employee and from disciplining or threatening discipline to an employee for requesting medical or first aid treatment or for following the orders or treatment plan of a treating physician.

55. The FRSA makes notifying or attempting to notify the railroad of a work related injury and obtaining medical care protected acts, for which the company is absolutely prohibited from retaliating against the employee in any way.

56. Ed restates and re-alleges paragraphs 7 - 52 and states that these facts, if true, make out a *prima facie* case under 49 U.S.C. § 20109.

57. For these wrongs, Ed seeks all relief necessary to make him whole including, but not limited to:

   a. Expungement of all references to the disciplinary actions taken against him;

   b. Compensatory damages including damages for mental anguish and emotional distress;

   c. The statutory maximum of punitive damages for BNSF's willful conduct and complete disregard for Ed's rights under the FRSA;

   d. All litigation costs including expert witness fees and attorney fees;

   e. All such other relief as is appropriate under the circumstances.

///

///

## CAUSE OF ACTION TWO:
## VIOLATION OF THE FEDERAL EMPLOYERS' LIABILITY ACT

58. Ed incorporates by reference and re-alleges paragraphs 7-52 as though fully set forth herein.

59. The Federal Employers' Liability Act ("FELA") is remedial legislation originally enacted by the United States Congress in 1908 to compensate railroad workers for personal injuries suffered in the course of their employment. Railroad workers covered under FELA are not eligible for state workers' compensation so FELA provides the sole remedy against their railroad employers for job-related injuries.

60. Under FELA, railroads such as BNSF have a non-delegable duty to provide its employees with a reasonably safe workplace.

61. At the time of his injury, Ed was employed by BNSF, a railroad carrier engaged in interstate commerce, and his work-related duties were in furtherance of interstate commerce as contemplated by 45 U.S.C. § 51.

62. Ed's injury was painful, inconvenient and frustrating to him. His injury harmed the quality of his life, required medical treatment and may require future medical treatment. Ed's injury is or may be permanent.

63. The specific negligence of BNSF will be developed during discovery. Nevertheless, Ed believes and therefore alleges that BNSF was negligent in the following ways:

    a. Failing to warn him of known or reasonably foreseeable dangers;

    b. Failing to provide him with adequate equipment;

    c. Failing to provide him with adequate assistance;

d. Failing to provide him with adequate information concerning the areas in which he was required to work;

e. Failing to adequately protect him from dangerous conditions;

f. Failing to test or properly evaluate the conditions and equipment with which he was required to work;

g. Failing to develop proper procedures for performing his work;

h. Improperly assigning him to duties likely to result in the injuries he suffered;

i. Failing to inspect work areas;

j. Failing to adopt and enforce proper rules, regulations, and procedures concerning work practices and work areas; and

k. Was otherwise negligent through its officers, agents and employees in ways that the plaintiff has not specifically alleged.

64. Ed has or may have suffered other damages as a result of the injury described above and he is entitled to compensation for injuries and damages recoverable under FELA, whether or not specifically alleged.

65. BNSF caused Ed's injury by violating FELA and related laws enacted for the safety of railroad workers. Because of its statutory negligence and violation of the law related to FELA, BNSF is legally obligated to compensate Ed for his injuries

66. For the reasons stated, Ed is entitled to damages under FELA in an amount to be determined at trial.

**PLAINTIFF DEMANDS A JURY TRIAL.**

DATED: September 16, 2013

| | | s/*Erica Mynarich* |
| --- | --- | --- |
| C. Kiel Garella | Jeff R. Dingwall | Erica Mynarich |
| (NC #42839) | (CA #265432) | (MO #62539) |
| kiel@gljustice.com | jeff@jrdingwall.com | erica@c2glaw.com |
| | | |
| GARELLA LAW, P.C. | LAW OFFICE OF JEFF R. DINGWALL, PLC | CARVER CANTIN & GRANTHAM |
| 409 East Boulevard | 402 West Broadway, Suite 400 | 901 E. St. Louis St, Suite 1600 |
| Charlotte, NC 28203 | San Diego, California 92101 | Springfield, Missouri 65806 |
| Tel: (980) 321-7933 | TELEPHONE: (619) 796-3464 | TELEPHONE: (417) 429-4754 |
| Fax: (704) 990-6734 | FACSIMILE: (619) 717-8762 | FACSIMILE: (417) 831-7373 |
| | | |
| *Pro hac* to be filed | *Pro hac* to be filed | |

ATTORNEYS FOR PLAINTIFF